PRERAK SHAH
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

JENNIFER A. NAJJAR, Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

*Attorney for Federal Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| COTTONWOOD ENVIRONMENTAL LAW CENTER, | ) ) ) | Case No. CV 18-12-BU-SEH |
| Plaintiff, | ) ) ) | **FEDERAL DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR** |
| v. | ) ) | **VOLUNTARY REMAND OR STAY OF PROCEEDINGS** |
| DAVID BERNHARDT, in his official capacity as Acting Secretary of the Interior, *et al.*, | ) ) ) ) | Administrative Procedure Act Case, |
| Defendants. | ) ) | 5 U.S.C. §§ 701–706 |
| _____ | ) | |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATUTORY BACKGROUND....................................................................................3

FACTUAL BACKGROUND.........................................................................................4

    I.     Partnership under the IBMP...................................................................4

    II.    Bison Management under the IBMP.......................................................5

ARGUMENT .................................................................................................................8

    I.     Voluntary Remand is Appropriate to Allow the Park Service to
          Prepare a New NEPA Document Analyzing Bison Management. .......9

    II.    Equitable Factors Counsel in Favor of Remanding Without
          Vacatur. ...............................................................................................13

          A.    The IBMP is not tainted by predetermination or bad faith,
                and any procedural errors can be cured on remand. .................16

          B.    Vacatur would be extremely disruptive and contrary to the
                public interest. ..........................................................................18

          C.    Cottonwood has not shown any irreparable harm
                warranting equitable relief. .......................................................22

    III.   Alternatively, this Court Should Stay Proceedings Pending the
          Completion of the Additional NEPA Analysis. ..................................24

CONCLUSION ............................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) .................................................................. 13, 16

*Amoco Prod. Co. v. Vill. Of Gambell*,
   480 U.S. 531 (1987) ...................................................................................15

*ASSE Int'l, Inc.v. Kerry*,
   182 F. Supp. 3d 1059 (C.D. Cal. 2016)..........................................................9, 10

*Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*,
   No. CV 12-9861-GW (SSx), 2016 WL 4445770 (C.D. Cal. Aug. 12, 2016).... 13,
   14, 16, 17

*Cal. Cmtys. Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012)...................................................... 10, 11, 13, 14, 18

*Cent. Power & Light Co. v. United States*,
   634 F.2d 137 (5th Cir. 1980) ..................................................................8

*Chronicle Publ'g. Co. v. Nat'l. Broad. Co.*,
   294 F.2d 744 (9th Cir. 1961) .................................................................26

*Citizens Against Pellissippi Parkway Extension, Inc. v. Mineta*,
   375 F.3d 412 (6th Cir. 2004) .................................................................11

*ConocoPhillips Co. v. EPA*,
   612 F.3d 822 (5th Cir. 2010)..................................................................10

*Ctr. for Biological Diversity v. Henson*,
   Civ. No. 08-946-TC, 2009 WL 1882827 (D. Or., June 30, 2009) .......................25

*Ctr. for Biological Diversity v. Salazar*,
   706 F.3d 1085 (9th Cir. 2013)...............................................................3

*Earth Island Inst. v. Gould*,
   No. 1:14-CV-01140-KJM-SKO, 2014 WL 4082021 (E.D. Cal. Aug. 19, 2014)15

*Edward W. Sparrow Hosp. Ass'n v. Sebelius*,
   796 F. Supp. 2d 104 (D.D.C. 2011) .................................................11

*Ethyl Corp. v. Browner*,
   989 F.2d 522 (D.C. Cir. 1993) .................................................................. 10, 12

*FBME Bank Ltd. v. Lew*,
   142 F. Supp. 3d 70 (D.D.C. 2015) ........................................................11

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ...........................................................................12

*Heckler v. Chaney. See,*
   470 U.S. 821 (1985) ...........................................................................21

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995)....................................................... 13, 18

*J.M. Martinac Shipbuilding Corp. v. Washington*,
   No. C06-1544 JCC, 2007 WL 445438 (W.D. Wash. Feb. 6, 2007) ...................24

*Kuang v. U.S. Dep't of Def.*, No. 18-cv-03698,
   2019 WL 1597495 (N.D. Cal. Apr. 15, 2019) ....................................26

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ...........................................................................24

*Limnia, Inc. v. U.S. Dep't of Energy*,
   857 F.3d 379 (D.C. Cir. 2017) .............................................................9

*Lockyer v. Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005)...............................................................24

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...........................................................................22

*McCollough v. Minn. Lawyers Mut. Ins. Co.*,
   No. CV-09-95-BLG-RFC-CSO, 2010 WL 441533 (D. Mont. Feb. 3, 2010)......25

*McCurdy v. Novartis Pharm. Corp.*,
   No. 1:11-cv-00740-AWI-SKO, 2012 WL 1551344 (E.D. Cal. May 1, 2012) ....25

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ...........................................................................15

*N. Coast Rivers All. v. U.S. Dep't of the Interior*,
   No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038 (E.D. Cal. Dec. 16, 2016) 9, 14

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*,
   275 F.Supp.2d 1136 (C.D. Cal. 2002)...................................................10

*Nat'l Wildlife Fed'n v. Espy*,
   45 F.3d 1337 (9th Cir. 1995)....................................................... 14, 15

*Pac. Rivers Council v. U.S. Forest Serv.*,
   942 F. Supp. 2d 1014 (E.D. Cal. 2013) .................................................................13

*Pit River Tribe v. U.S. Forest Serv.*,
   615 F.3d 1069 (9th Cir. 2010) ...............................................................................15

*Pollinator Stewardship Council v. EPA*,
   806 F.3d 520 (9th Cir. 2015) .................................................................................18

*Rivers v. Walt Disney Co.*,
   980 F. Supp. 1358 (C.D. Cal. 1997) .......................................................................26

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) .................................................................................................3

*Shands Jacksonville Med. Ctr. v. Burwell*,
   139 F. Supp. 3d 240 (D.D.C. 2015) .......................................................................14

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) .................................................................13

*SKF USA Inc. v. United States*,
   254 F.3d 1022 (Fed. Cir. 2001) ................................................................. 9, 10, 11

*Slaughter v. Nat'l Park Serv.*,
   No. CV 19-128-BLG-SPW, 2019 WL 6465093 (D. Mont. Dec. 2, 2019) .. 21, 22, 23

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
   282 F. Supp. 3d 91 (D.D.C. 2017) .........................................................................14

*Trujillo v. Gen. Elec. Co.*,
   621 F.2d 1084 (10th Cir. 1980) ...............................................................................9

*Util. Solid Waste Activities Grp. v. EPA*,
   901 F.3d 414 (D.C. Cir. 2018) .................................................................................9

*W. Watersheds Project v. Salazar*,
   494 F. App'x 740 (9th Cir. 2012) ...........................................................................17

*W. Watersheds Project v. Salazar*,
   766 F. Supp. 2d 1095 (D. Mont. 2011) ..................................................................19

*W. Watersheds Project v. Salazar*,
   No. CV 09-159-M-CCL, 2011 WL 882641 (D. Mont. Mar. 10, 2011). 18, 19, 21, 23

iv

*Westlands Water Dist. v. Firebaugh Canal,*
    10 F.3d 667 (9th Cir. 1993) ............................................................................15

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ............................................................................................22

**Statutes**

5 U.S.C. § 706(1) ........................................................................................................20

5 U.S.C. § 7913 ..........................................................................................................20

16 U.S.C. § 26 ..............................................................................................................6

16 U.S.C. § 7912(a) ......................................................................................................7

42 U.S.C. § 4332(2)(C) ................................................................................................3

MONT. CODE. ANN. § 87-1-216(2)(c) ......................................................................7

MONT. CODE. ANN. § 87-2-730 ................................................................................7

**Regulations**

40 C.F.R. § 1502.9(c) ..................................................................................................4

40 C.F.R. § 1502.9(c) ................................................................................................11

# **INTRODUCTION**

Federal Defendants[1] move for administrative remand to allow the National Park Service and the cooperating agencies to conduct additional National Environmental Policy Act ("NEPA") analysis related to the Interagency Bison Management Plan ("IBMP"), which Plaintiff Cottonwood Environmental Law Center challenges here.  Cottonwood challenges the IBMP, the plan which facilitates Federal, State, and Tribal coordination over bison management to achieve the shared goal of a wild, sustainable bison herd in the Greater Yellowstone Ecosystem.  Specifically, Cottonwood argues that the Final Environmental Impact Statement should be supplemented based on: (1) "new tribal hunting"; (2) the publication of a 2017 National Academies of Sciences, Engineering, and Medicine publication on brucellosis in the greater Yellowstone area; and, (3) a bison population objective number included in one of six proposed alternatives listed in a 2015 Notice of Intent, published by the Park Service, for new analysis related to the IBMP.

The Park Service has decided to prepare an additional NEPA analysis considering at least: (1) significant changed circumstances since the IBMP's

---

[1] Plaintiff brought suit against the Secretary of Interior, David Bernhardt, Superintendent of Yellowstone National Park, Cam Sholly, the National Park Service, Regional Forester, Leanne Marten, the United States Forest Service, and the Animal and Plant Health Inspection Service (collectively, the "Federal Defendants").

adoption in 2000; (2) the impacts of adaptive management changes to the IBMP since its adoption; and (3) a range of alternative options for bison management in Yellowstone National Park.  The Forest Service has expressed its willingness and intention to participate as a cooperating agency in that endeavor.[2]  This Court should grant voluntary remand of the activities challenged by Cottonwood to allow the agencies to focus their resources on that new analysis.  Voluntary remand will conserve the parties' and the Court's resources, and Cottonwood will have the opportunity to participate in the new NEPA process, redressing its alleged procedural injuries.

Further, because the equities favor allowing the current bison management framework to remain in place while the agencies prepare that analysis, remand should be without vacatur.  Remand without vacatur is appropriate here because (1) the agencies have not committed any error, (2) vacatur will result in a significant burden to the agencies, (3) vacatur will result in environmental harm, and (4) the relief requested exceeds this Court's jurisdiction.

Alternatively, this Court should stay further proceedings in this litigation while the agencies prepare additional NEPA analysis.  A stay would allow the agencies to focus their resources on that analysis and would narrow the scope of

---

[2] As of the date of this filing, the Animal and Plant Health Inspection Service ("APHIS"), Veterinary Services, has not determined the nature of its participation, if any.

2

the issues for this Court's review without duplicative and unnecessary litigation over an earlier decision process that will be augmented.

For these reasons, this Court should grant Federal Defendants' motion for remand without vacatur, and deny Cottonwood's request to enjoin hunting,[3] hazing, culling, and enforcement of a drop-dead line under the IBMP. Alternatively, this Court should stay these proceedings to allow the agencies to prepare additional NEPA analysis.

## STATUTORY BACKGROUND

NEPA is a procedural statute—it does not contain substantive environmental standards or mandate certain results, but rather requires that federal agencies "perform environmental analysis before taking any 'major Federal actions significantly affecting the quality of the human environment.'" *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1094 (9th Cir. 2013) (quoting 42 U.S.C. § 4332(2)(C)).  It is "well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley*

---

[3] While Cottonwood asked this Court to enjoin hunting under the IBMP in its motions for a temporary restraining order or preliminary injunction, ECF Nos. 113, 114, 122, 133, Cottonwood did not seek to enjoin hunting in its amended complaint.  *See generally* ECF No. 91.  Accordingly, Cottonwood should not be permitted to seek an order enjoining hunting, which does not ordinarily begin until later in the year.  Additionally, authorization to hunt is under the jurisdictional authority of Montana and the respective tribes.  Federal Defendants do not authorize hunting.

*Citizens Council*, 490 U.S. 332, 350 (1989).  Additional NEPA analysis is required where either: (1) the agency has substantially changed the action from that analyzed in an earlier NEPA document or (2) substantially new information has come to light bearing on environmental concerns, but agencies "[m]ay also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so."  40 C.F.R. § 1502.9(c)(1)-(2).

## FACTUAL BACKGROUND

### I.    Partnership under the IBMP

Bison are an essential component of the Greater Yellowstone ecosystem, and the Park Service is committed to responsible bison management within Yellowstone National Park.  But the Park is not self-contained; during winter months, bison migrate out of the Park and onto National Forest System lands, state lands, and private lands.  IBMP ROD at 4-5.  As the herd migrates out of the Park, the entities with jurisdiction over the herd change:

> Within the boundaries of Yellowstone National Park, the Secretary of the Interior has exclusive jurisdiction to manage the park's natural resources, including the bison.  Outside the park the State of Montana has the management authority over the bison.  When the bison are on national forest system lands, the U.S. Forest Service has responsibilities under federal laws to provide habitat for the bison, a native species.  Federal law requires [the USDA, Animal and Plant Health Inspection Service ("APHIS"), Veterinary Services] to control and prevent the spread of communicable and contagious diseases of livestock.

*Id*. at 6.  To help coordinate bison management across different jurisdictions—and as part of a court-mediated settlement—the Park Service, Forest Service, APHIS, Montana Department of Livestock ("MDOL"), and Montana Department of Fish, Wildlife, and Parks adopted the IBMP in 2000.[4]

The IBMP memorializes communication and coordination between the members by enumerating their respective roles and responsibilities.  It does not alter or enlarge the jurisdiction of its signatories.  2020 Winter Operating Plan (ECF No. 202) at 4 ("The level of participation and support by personnel in bison management actions as set forth in the IBMP remains subject to each IBMP member's supervision, jurisdiction, specific authority, and administrative oversight.").  The members coordinate their respective bison management activities each year in the form of an annual Winter Operating Plan.  Ex. 3, Decl. of Mary C. Erickson, Forest Supervisor for the Custer-Gallatin National Forest, ¶ 9, ("Erickson Decl.").

## II.    Bison Management under the IBMP

Bison management under the IBMP is aimed at maintaining a wild, wide-ranging bison population, preventing the spread of brucellosis, and ensuring public

---

[4] The agencies adopted the decision to join the IBMP through the IBMP Record of Decision ("IBMP ROD"), which was informed by the analysis in the 2000 IBMP Final Environmental Impact Statement.  *See generally* ECF No. 203 (hereinafter "ROD").

safety, among other goals and objectives.  *See generally* 2020 Winter Operating

Plan.  In an effort to meet these objectives, IBMP partners engage in hazing and

removal of bison.

The IBMP acknowledges that the Park Service has exclusive jurisdiction

over bison management actions within the boundaries of the Park.  ROD, 6.

Hazing operations outside of the Park are led by MDOL.  2020 Winter Plan, 11.

Hazing is a tool used under the IBMP to manage bison distribution.  ECF No. 129-

3 at ¶ 13.  Hazing often involves several individuals on horseback approaching

bison to encourage movement to a "tolerance area."  *See id.* ¶ 14.  The agencies

manage bison distribution to prevent bison dispersal to non-tolerance areas, protect

private property, promote safety, and prevent the spread of brucellosis.  *Id.* ¶ 13.

While MDOL oversees all hazing outside of the Park, APHIS, Veterinary Services

occasionally provides assistance at the State's request.  *Id.* ¶¶ 12, 14 (noting that

hazing typically occurs up to three days per week during a two-week period each

year).

Removal of bison takes several forms, including capture and removal, State-

regulated public bison hunting outside of the Park, and tribal hunting outside of the

Park.  The IBMP Partners are committed to ensuring that all bison removal

management activities are conducted safely.

6

The Federal Government does not authorize or permit bison hunting, and hunting of any kind is prohibited by statute in Yellowstone National Park. 16 U.S.C. § 26. In contrast, National Forest System Lands are generally "open to hunting, fishing and recreational shooting" in accordance with state law. 16 U.S.C. § 7912(a); *accord* United States Forest Service, *Know Before You Go: Hunting*, https://www.fs.fed.us/visit/know-before-you-go/hunting (last visited Oct. 29, 2019) ("the rules [for hunting on Forest Service land] are simple: Follow the state laws and regulations pertaining to hunting, including seasons, dates and licensing.").

The State of Montana regulates bison hunting within its borders, including issuing permits to members of the public. MONT. CODE. ANN. §§ 87-1-216(2)(c) and 87-2-730. In addition, several American Indian Tribes have exercised their treaty-based hunting rights on certain lands outside of the Park. *See* 2020 Winter Operating Plan at 5-9.

State and Tribal bison hunting has taken place on the Custer-Gallatin National Forest each winter since 2005. And the IBMP Partners have worked together to ensure that bison hunting is conducted safely within the framework of each entity's jurisdiction and authority. *See e.g.* Erickson Decl. ¶¶ 11-12 (noting that the IBMP Partners agreed to respect a 150-yard buffer—now referred to as the "Clean Zone"—where shooting is not permitted); *see also* ECF No. 220, 2017 Memorandum of Agreement 1, 7-8 (adopting safety protocols that include limiting

7

the number of total hunters at a given time, designating a "lead hunter" to ensure that all hunters follow safety regulations, and agreeing to "have law enforcement at Beattie Gulch anytime [a tribe] has a permitted hunter or hunters in Beattie Gulch.").

## **ARGUMENT**

Voluntary remand is the appropriate vehicle to allow the National Park Service and cooperating agencies to prepare an additional NEPA analysis. That remand should be without vacatur. Cottonwood has not met its burden to show a likely, irreparable harm. Additionally, a court order vacating the IBMP and enjoining the agencies from coordinating with State and Tribal governments would be unduly disruptive to agency operations and management of their respective lands, increase the risk of transmission of brucellosis from bison to cattle, and endanger public safety and private property, and thus is contrary to the public interest. Moreover, Cottonwood's request for an injunction prohibiting hunting bison, and hazing and culling bison *outside* of the Park would be impossible to implement and would be contrary to the public interest.

For these reasons, this Court should grant the agencies' request for voluntary remand without vacatur

### I.  Voluntary Remand is Appropriate to Allow the Park Service to Prepare a New NEPA Document Analyzing Bison Management.

A motion for voluntary remand seeks remand from a court to an agency "without consideration of the merits." *Cent. Power & Light Co. v. United States*, 634 F.2d 137, 145 (5th Cir. 1980).  "Courts in this Circuit generally look to the Federal Circuit's decision in *SKF USA* for guidance when reviewing requests for voluntary remand." *N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 1:16-cv-00307-LJO-MJS, 2016 WL 8673038, at *3 (E.D. Cal. Dec. 16, 2016) (citations omitted).  There, the Federal Circuit concluded that an agency may request a remand for a variety of reasons, including (1) "intervening events outside of the agency's control"; (2) because "it believes that its original decision was incorrect on the merits"; or (3) simply "to reconsider its previous position." *SKF USA Inc. v. United States*, 254 F.3d 1022, 1028-29 (Fed. Cir. 2001); *accord Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 386-87 (D.C. Cir. 2017).  Even in the absence of "intervening events, the agency may request a remand (without confessing error) in order to reconsider its previous position." *SKF*, 254 F.3d at 1028-29; *see also Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 436 (D.C. Cir. 2018) (per curiam).  Voluntary remand is consistent with the principle that "[a]dministrative agencies have an inherent authority to reconsider their own decisions," *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980), and "also fosters judicial economy by giving the relevant agency the opportunity to

9

reconsider and rectify an erroneous decision without further expenditure of judicial resources." *ASSE Int'l, Inc.v. Kerry*, 182 F. Supp. 3d 1059, 1063 (C.D. Cal. 2016).

Courts "routinely grant" requests for voluntary remand, preferring to allow agencies to cure their own mistakes or consider the potential impact of new information rather than wasting the courts' and the parties' resources on unnecessary judicial review. *Id.* (citing *Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F.Supp.2d 1136, 1141 (C.D. Cal. 2002)); *see also Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993). Unless the agency's request is "frivolous or made in bad faith," a remand is usually appropriate. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (hereinafter "*CCAT*")) citing *SKF*, 254 F.3d at 1029).

Federal Defendants' request to remand and stay this litigation while it prepares additional NEPA analysis related to the IBMP is not frivolous nor is it made in bad faith. Rather, the request is eminently reasonable given the passage of time since the ROD was adopted. Indeed, the Park Service sought to supplement the NEPA analysis in 2015 but did not complete the process because competing priorities overtook the agencies' limited resources. Remand is appropriate under an agency's inherent authority to reconsider its own decisions. *See ConocoPhillips Co. v. EPA*, 612 F.3d 822, 832 (5th Cir. 2010); *SKF*, 254 F.3d at 1029.

10

Here, the Park Service is committed to engage in additional NEPA analysis of its bison management practices.  Ex. 1, Decl. of Cameron H. Sholly, Yellowstone National Park Supervisor, ¶ 4 ("Sholly Decl.").  That analysis will "incorporate new information and changed circumstances, describe adaptive management adjustments to the IBMP since 2000, and evaluate the effects of alternative approaches for managing bison."  *Id.*  While the full scope of analysis cannot be determined at this early stage, the Park Service's analysis will consider at least "different bison population ranges, options for managing bison inside the park, and actions for dealing with brucellosis in bison,"  *id.* ¶ 5, and the indirect impacts of bison management—including hunting—outside of the Park.  *Id.* ¶ 7.  The Forest Service "is willing to and intends to participate as a Cooperating Agency" in the new NEPA analysis.  Erickson Decl. ¶¶ 5-6.

Additional NEPA analysis will also redress Cottonwood's alleged procedural injury and allow for Cottonwood to participate in the new administrative process.  *See CCAT*, 688 F.3d at 993 ("[A]ny disadvantage petitioners suffered can be corrected on remand when they will have an opportunity to comment meaningfully on the documents.").  Upon completion, the additional NEPA analysis will comply with NEPA's instruction that agencies should consider any new information or changed circumstances.  40 C.F.R. § 1502.9(c).  When, as here, "an agency seeks a remand to take further action

11

consistent with correct legal standards, courts should permit such a remand in the
absence of apparent or clearly articulated countervailing reasons." *FBME Bank
Ltd. v. Lew*, 142 F. Supp. 3d 70, 73 (D.D.C. 2015) (quoting *Citizens Against
Pellissippi Parkway Extension, Inc. v. Mineta*, 375 F.3d 412, 416 (6th Cir. 2004));
*see also Edward W. Sparrow Hosp. Ass'n v. Sebelius*, 796 F. Supp. 2d 104, 107
(D.D.C. 2011) ("[W]here an agency has not considered all of the relevant factors,
'the proper course . . . is to remand to the agency for additional investigation or
explanation.'" (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744
(1985))).  There is no reason to delay this new NEPA analysis—this Court should
grant a voluntary remand so the agencies can begin their work.

Granting this motion will not only enable the Park Service to begin this
analysis, it will also conserve judicial resources.  Courts have recognized that
judicial economy is an important consideration in determining whether to grant a
voluntary remand.  *See Ethyl Corp.*, 989 F.2d at 524 & n.3.  Here, it serves judicial
economy to permit the Park Service to start a new NEPA process, rather than have
the Court prepare an opinion addressing Cottonwood's claims while additional
NEPA analysis is ongoing.  If Cottonwood is dissatisfied with the additional NEPA
analysis, any remaining claims or disputes could be litigated when that process is
complete.

12

Finally, granting this motion will not prejudice Cottonwood.  Indeed, granting the motion will provide the additional NEPA analysis Cottonwood sought in its complaint.  *See generally* ECF No. 91.  Cottonwood and its members—like the rest of the public—will be able to participate in the new analysis and will have the opportunity to help inform the agencies' decision-making processes for future bison management.

For these reasons, this Court should grant the agencies' request for voluntary remand to allow the agencies to immediately begin a new NEPA analysis.

## II.     Equitable Factors Counsel in Favor of Remanding Without Vacatur.

Remand should also be without vacatur, leaving the current bison management practices in place while the agencies prepare additional NEPA analysis.  "Vacatur is a species of equitable relief" and should not be "mechanically" granted.  *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1105 (E.D. Cal. 2013), *appeal filed,* No. 13-16105 (9th Cir. May 31, 2013); *see also Beverly Hills Unified Sch. Dist. v. Fed. Transit Admin.*, No. CV 12-9861-GW (SSx), CV 13-1144-GW(SSx), CV 13-8609-GW(SSx), CV 13-8621-GW(SSx) 2016 WL 4445770, at *7 (C.D. Cal. Aug. 12, 2016).  Indeed, when equity demands, an action or a regulation "can be left in place while the agency follows

the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

Therefore, whether agency action should be vacated depends on the two-factor test that weighs (1) the seriousness of an agency's errors, and (2) "the disruptive consequences of an interim change that may itself be changed." *CCAT*, 688 F.3d at 992 (quoting *Allied-Signal Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). There is "no rule requiring either the proponent or opponent of vacatur to prevail on both factors." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017) (quoting *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 270 (D.D.C. 2015)).

The first factor considers the likelihood that the new process could cure any earlier decision-making errors, to the extent that there are any. *See, e.g.*, *Beverly Hills Unified Sch. Dist.*, 2016 WL 4445770, at *6 (explaining that the first factor may include consideration of whether the agency "could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand"); *N. Coast Rivers All.*, 2016 WL 8673038, at *8 ("One way to measure the seriousness of an agency's errors is to attempt to evaluate the likelihood that the agency will be able to justify future decisions that would follow the status quo."). The second factor considers

14

the disruptive consequences flowing from vacatur, asking whether the equities favor the status quo. *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).

To determine the "disruptive consequences" of setting aside an agency action, *CCAT*, 688 F.3d at 992, courts consider the impact of a vacatur as compared to the circumstances if the agency action were left in place. *Nat'l Wildlife Fed'n*, 45 F.3d at 1343. Thus, in balancing the equities of the disruptive consequences, this Court should look to the same equitable factors it considers for injunctions. *See id.*; *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080-81 (9th Cir. 2010) (citing injunction cases for the proposition that "[o]ur courts have long held that relief for a NEPA violation is subject to equity principles"); *Westlands Water Dist. v. Firebaugh Canal*, 10 F.3d 667, 673 (9th Cir. 1993) (categorizing decisions to set aside agency actions as "equitable relief").

"An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Earth Island Inst. v. Gould*, No. 1:14-CV-01140-KJM-SKO, 2014 WL 4082021, at *3 (E.D. Cal. Aug. 19, 2014) (internal quotations and emphasis omitted) (denying injunction against Forest Service timber harvest project). Courts may not presume irreparable harm, even where environmental injury is alleged. *Amoco Prod. Co. v. Vill. Of*

15

*Gambell*, 480 U.S. 531, 541 (1987) (rejecting rule that "[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action." (quotation omitted)).

The nature of any agency error (to the extent there is one) and the disruptive consequences of vacatur counsel against vacatur here.

A.  *The IBMP is not tainted by predetermination or bad faith, and any procedural errors can be cured on remand.*

The first *Allied-Signal* factor includes consideration of the seriousness of the agencies' errors and whether the agencies could reach the same result after curing those errors.  *See Allied-Signal*, 988 F.2d at 151 (holding that vacatur was not warranted where it was "conceivable" and "at least a serious possibility that the [agency would] be able to substantiate its decision on remand.").  For example, in *Beverly Hills Unified School District*, the court found several procedural deficiencies in the agency's analysis of a proposed subway expansion project, including two that the court described as "clearly pressing and substantial."  2016 WL 4445770, at *7.  Nevertheless, the court "did not find that the [agency] had actually made substantive decisions . . . that were demonstrably wrong" and found "no indication that the [agency] would be unable to offer better and/or more complete reasoning for its challenged decisions" following remand.  *Id.*  In contrast, the court suggested that if the agency "had engaged in any improper 'pre-

16

determination' or bad faith in its treatment of the issues" then remand without vacatur would not be appropriate. *Id.*

Similarly, here, there is at least a serious possibility that the agencies can cure any procedural errors related to the IBMP and adopt a bison management framework that is substantially similar or identical to the status quo. The additional NEPA analysis will "consider changed circumstances, describe adaptive management adjustments to the IBMP since 2000, and evaluate the effects of alternative approaches for managing bison." Sholly Decl. ¶ 4. But there is no reason to think that the agencies could not reach the same decisions following that process. There are no "fundamental flaws in the agency's decision[s]" that prevent adoption of a similar scheme following the remand. *Beverly Hills Unified Sch. Dist.*, 2016 WL 4445770, at *6. The IBMP and its structure have withstood other challenges in the past, confirming that the original decision could well be adopted again on remand. *See W. Watersheds Project v. Salazar*, 494 F. App'x 740, 742 (9th Cir. 2012) (rejecting challenge to IBMP practices because "[t]he law does not require the Forest Service to provide management direction for all animal species located on a forest" and "the Park Service has discretion to manage the Yellowstone bison at levels that can be accommodated on the available range."). Simply stated, as in *Beverly Hills Unified School District*, the agency has not

17

"made substantive decisions . . . that were demonstrably wrong."  2016 WL 4445770, at *7.

The agencies cannot yet know the outcome of their additional NEPA analysis, and may make changes to their current bison management practices following the new NEPA analysis.  But because the agencies could decide to continue with the current management direction following remand, the first *Allied-Signal* factor is either neutral or weighs slightly against vacatur.

B. *Vacatur would be extremely disruptive and contrary to the public interest.*

As previously discussed, the IBMP was the result of years of negotiation and analysis by multiple stakeholders to address numerous, highly sensitive issues relating to the Yellowstone bison herd.  Vacatur would have extremely disruptive effects for the federal agencies and other IBMP partners, and could result in significant environmental harm, which is not in the public's interest.  In evaluating the disruptive consequences of vacatur, the Ninth Circuit has explained that courts should "consider the disruptive consequences of an interim change that may itself be changed.'"  *See CCAT*, 688 F.3d at 992.  Courts may also "consider whether vacating a faulty [decision] could result in possible environmental harm." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015); *accord CCAT*, 688 F.3d at 992.  The Ninth Circuit has cautioned that "'when equity demands, the [decision] can be left in place while the agency follows the necessary

18

procedures' to correct its action." *CCAT*, 688 F.3d at 992 (quoting *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405).

Here, vacatur risks disruption by removing the established coordination framework between Federal, State, and Tribal agencies while the Park Service updates the NEPA analysis. "If the Court were to enjoin the functioning of the IBMP, a complex wildlife management program would be disabled and left in disarray." *See W. Watersheds Project v. Salazar (Salazar II)*, No. CV 09-159-M-CCL, 2011 WL 882641, at *5 (D. Mont. Mar. 10, 2011).

First, vacatur would confuse members of the public and disrupt agency function. For example, vacatur would result in "confusion about the management framework for bison on National Forest System lands" and the expenditure of "increased Forest Service time and resources to respond to changes in turn on dates for grazing allotments and potential property damage and safety concerns at trailheads and campgrounds." Erickson Decl. ¶ 16. Actions necessary to meet the IBMP's objectives would be halted, including efforts to: (1) monitor bison to determine current and desired population size and distribution; (2) define tolerance zones to limit the spread of brucellosis; (3) identify and reduce risks posed by bison to the public; (4) protect livestock; and (5) coordinate in the management of natural and cultural resource values important to IBMP members not named in this suit. *Id.* ¶ 17.

The resulting confusion could harm the bison and impact public safety. Vacatur would inhibit the agencies' management actions, which could result in property damage, raise safety concerns, increase competition with livestock for forage, and risk the spread of brucellosis from bison to cattle.  Reid Decl. ¶ 14; ECF 129-3 ¶¶ 17-19; *Salazar II*, 2011 WL 882641, at *6 (detailing the types of public safety and private interest concerns the IBMP helps address).  In turn, this would then frustrate efforts to increase the public's tolerance of bison outside of the Park.  Ex. 2, Decl. of P.J. White, (White Decl.), ¶¶ 10-12; *see also W. Watersheds Project v. Salazar (Salazar III)*, 766 F. Supp. 2d 1095, 1118 (D. Mont. 2011), (noting that tolerance for bison outside the Park is linked to decreasing prevalence of brucellosis in bison and a management regime where bison are allowed to roam outside the Park on public and private land), *aff'd* in part, 494 F. App'x 740 (9th Cir. 2012).  Absent coordinated bison herd management, larger numbers of bison could migrate in the winter, which could cause the State of Montana to "impose stricter constraints on bison abundance and distribution, which would be a setback for bison conservation and restoration."  White Decl. ¶ 12.

To the extent Cottonwood seeks an injunction requiring the agencies to prevent bison hunting or hazing outside of the Park, that request is neither feasible nor in the public interest.  As discussed above, bison hunting does not depend on

the IBMP, and the agencies have never authorized or permitted the hunt.

Similarly, hazing outside of the Park is overseen by MDOL.  ECF No. 129-3 ¶ 12.

A court-ordered forest closure premised on this Court's authority to "compel

agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1),

would contravene the statutorily-prescribed mechanism for National Forest System

hunting closures found in the Dingell Act, 5 U.S.C. § 7913, and may well violate

the treaty-secured hunting rights of American Indian Tribes not before the Court.

And because an effective forest closure requires enforcement, Cottonwood's

requested relief also runs afoul of the Supreme Court's decision in *Heckler v.*

*Chaney*. *See* 470 U.S. 821, 831 (1985) (holding that enforcement decisions are

"generally committed to an agency's absolute discretion.").  In fact, at oral

argument on the State's Motion to Dismiss, Cottonwood conceded that the State

must be a party to this case to provide the relief Cottonwood seeks.  ECF No. 144.

It is clear that vacatur or an injunction would negatively impact substantial

federal, state, tribal, and local interests.  For these reasons, courts have repeatedly

rejected efforts to enjoin this important framework.  *Slaughter v. Nat'l Park Serv.*,

No. CV 19-128-BLG-SPW, 2019 WL 6465093 at *2, 5 (D. Mont. Dec. 2, 2019)

(concluding that an injunction of the IBMP was improper because the balance of

harms and public interest, particularly the interests of several American Indian

tribes, weigh in favor of keeping the plan in place); *Salazar II*, 2011 WL 882641,

21

at *7 (concluding "[a]n injunction would not serve the long-term best interest of the YNP bison herd and could unbalance the public interests that the IBMP seeks to protect.").  Accordingly, the balance of hardships and the public interest favor maintaining the status quo while the federal agencies engage in additional NEPA analysis.  *Id.*

Because vacatur or an injunction would be extremely disruptive, this Court's remand should be without vacatur to allow the agencies to prepare a new NEPA analysis while maintaining their current bison management practices during the interim period.

C. *Cottonwood has not shown any irreparable harm warranting equitable relief.*

In seeking an equitable remedy, Cottonwood bears the burden of making a "clear showing" and presenting "substantial proof" that it will suffer imminent, irreparable harm in the absence of an injunction.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).  As Federal Defendants showed in their Opposition to Cottonwood's motions for emergency relief,[5] ECF No. 129 at 18-24, Cottonwood offers no more than vague, conclusory references to its alleged injuries.  ECF Nos. 113-114, 123-124.

---

[5] Federal Defendants reincorporate the arguments made in their Opposition to Cottonwood's Motion for Preliminary Injunction here.  ECF No. 129.

Cottonwood's allegations of harm are not imminent or irreparable. Cottonwood offers no evidence to support its premise that there is "new tribal hunting," the hunt is dangerous, or its members participate in the hunt such that they would be at risk.[6]  *See generally* Am. Compl.; *see also Id.; Slaughter*, 2019 WL 6465093, at *5.

Similarly, Cottonwood's alleged recreational, conservation, and scientific injuries fail to meet the rigorous standard for showing irreparable harm. Cottonwood relies on its flawed reading of the 2017 Publication to argue that hazing and the enforcement of the Zone 2 Drop Dead Line is no longer necessary. Cottonwood has not demonstrated how its members' interests will be impacted by hazing, which typically involves herding bison on horseback over a two-week period of time each year.  Additionally, "[t]he culling of individual Yellowstone bison is not an irreparable harm per se."  *Salazar II*, WL 882641, at *4 (holding that "the Yellowstone herd is not in any way irreparably harmed by the proposed slaughter of a few hundred diseased and brucellosis-exposed bison out of 3,700.").

---

[6] Cottonwood's vague, speculative injury allegations rely on a tenuous chain of causation involving third-party actors, the hunters who operate under the jurisdictional authority of Montana and the respective tribes.  Cottonwood fails to show an injury that its members actually suffered or are likely to suffer as a result of the challenged federal action.  Additionally, to the best of Federal Defendants' knowledge, there has never been a gunshot injury associated with the annual bison hunt. Erickson Decl. ¶ 13.

Thus, Cottonwood's contention – without any evidence or explanation – that its members would be injured by the hazing or culling of bison fails.

Finally, Cottonwood's interests in viewing bison are not irreparably harmed by the annual hunt because "[i]t is undisputed thousands of bison roam freely year-round only minutes down the road in Yellowstone National Park where hunting is not allowed." *Slaughter*, 2019 WL 6465093, at *5.

Because Cottonwood has not shown an irreparable harm warranting equitable relief, neither vacatur nor Cottonwood's requested injunction should issue during the remand.

### III. Alternatively, this Court Should Stay Proceedings Pending the Completion of the Additional NEPA Analysis.

Alternatively, this Court should stay further proceedings pending the completion of the additional NEPA analysis. The power to stay proceedings is incidental to the power of a court to control its own docket, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936), and is appropriate where the delay is "not immoderate in extent and not oppressive in its consequences . . . ." *Id.* at 256. In exercising its discretion to issue a stay, the Court balances three factors: (1) "the possible damage which may result from the granting of a stay," (2) "the hardship or inequity which a party may suffer in being required to go forward," and (3) "the orderly course of justice measured in terms of the simplifying or complicating of

24

issues, proof, and questions of law which could be expected to result from a stay."
*Lockyer v. Mirant Corp.* 398 F.3d 1098, 1110 (9th Cir. 2005) (citation omitted).

Here, all three factors weigh in favor of granting the stay.  As an initial
matter, Federal Defendants would be prejudiced if the stay is not granted.  Without
a stay, the parties will be required to litigate, and the Court to adjudicate, the same
fundamental issues that are already being reconsidered by the Park Service in the
additional NEPA analysis.  *J.M. Martinac Shipbuilding Corp. v. Washington*, No.
C06-1544 JCC, 2007 WL 445438 at *4 (W.D. Wash. Feb. 6, 2007) (noting that it
is prejudicial to force Defendants to proceed in litigation "when it is already clear
that the outcome of the [administrative proceedings] will impact the final
resolution of this case[.]").  Additionally, the new NEPA process could be delayed
if the agency's limited resources are diverted to defending litigation when the
NEPA document at issue in the litigation is already in the process of being
augmented.

In contrast, Cottonwood will not be prejudiced if the stay is granted.
Cottonwood's speculative and vague injury allegations are unfounded and do not
weigh against the granting of a stay.  *Ctr. for Biological Diversity v. Henson*, Civ.
No. 08-946-TC, 2009 WL 1882827, at *2 (D. Or., June 30, 2009) (granting a stay
pending the completion of a BiOp and dismissing plaintiff's assertions of harm
from a stay as attenuated and speculative); *see also McCollough v. Minn. Lawyers*

25

*Mut. Ins. Co.*, No. CV-09-95-BLG-RFC-CSO, 2010 WL 441533, at *6 (D. Mont. Feb. 3, 2010) (rejecting plaintiff's claimed harm from stay as "too speculative"); *McCurdy v. Novartis Pharm. Corp.*, No. 1:11-cv-00740-AWI-SKO, 2012 WL 1551344, at *6 (E.D. Cal. May 1, 2012) (same).  Additionally, Cottonwood is receiving the relief it seeks—additional NEPA analysis.

Finally, because the additional NEPA analysis will likely resolve, narrow, or clarify the issues in this case, a stay will avoid "wasteful duplication of effort." *Chronicle Publ'g. Co. v. Nat'l. Broad. Co.*, 294 F.2d 744, 747-48 (9th Cir. 1961); *Kuang v. U.S. Dep't of Def.*, No. 18-cv-03698, 2019 WL 1597495, at *6 (N.D. Cal. Apr. 15, 2019) (concluding that because the stay does not involve a separate proceeding there is no question that a stay will serve judicial economy).  Pausing this litigation and allowing the new NEPA analysis process to proceed[7] would serve the interests of judicial economy.  *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1362 (C.D. Cal. 1997).

## CONCLUSION

For the foregoing reasons, this Court should grant the agencies' request for voluntary remand and remand the challenged actions back to the agencies without

---

[7] The agencies are eager to begin and complete the additional NEPA analysis. While the agencies are not able to provide a timeline for that analysis at the outset, Federal Defendants will provide this Court with regular status reports during the NEPA process.

vacatur.  Alternatively, this Court should stay further proceedings in this matter

pending completion of the agencies' additional NEPA analysis.

Respectfully submitted this 1st day of July, 2020.

PRERAK SHAH
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources
Division

*/s/Jennifer A. Najjar*
JENNIFER A. NAJJAR
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tele: (202) 305-0476
Fax: (202) 305-0506
Jennifer.najjar@usdoj.gov

*Attorney for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rules 7.1 and 24.1 of the Rules of Procedure of the United States District Court for the District of Montana, I certify the following:

1. This document is double spaced except for footnotes and quoted and indented material;

2. This document is proportionally spaced, using Times New Roman, 14 point font; and

3. This document contains 6,006 words as calculated by Microsoft Word.

## CERTIFICATE OF SERVICE

I hereby certify that on July 1, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ *Jennifer A. Najjar*
JENNIFER A. NAJJAR
U.S. Department of Justice